CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 20 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| FRED LEWIS WILSON, | ) |
| Plaintiff, | ) Case No. 7:09CV00503 |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| C/O J. HALL, | ) By: Glen E. Conrad |
| | ) United States District Judge |
| Defendant. | ) |

Plaintiff Fred Lewis Wilson, a Virginia inmate proceeding pro se, brings this action as a civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28 U.S.C. § 1343. In his complaint, Wilson alleges that the defendant, a correctional officer at Red Onion State Prison, purposely jerked a strap attached to Wilson's handcuffs, maliciously and wantonly inflicting harm on him in violation of the Eighth Amendment. The parties have filed opposing motions for summary judgment. For the reasons that follow, the court will grant the defendant's motion and deny plaintiff's motion.

**Factual Background**

In August 2009, Wilson was assigned to a segregation unit at Red Onion, which is a maximum security prison. Security procedures call for all segregation inmates to be restrained with leg irons and handcuffs before being brought out of their cells. The inmate is to back up to the cell door so that security staff may apply the handcuffs and the attached immobilization strap through the tray slot in the door. Once the cuffs are in place, the inmate is instructed to step

forward, back into the cell, and kneel down, facing the back wall. The cell door is opened, and the officers enter the cell and apply the leg irons to the inmate's ankles. The officers then bring the inmate to his feet and escort him from the cell. Upon return to the cell, these procedures are reversed. The inmate kneels in the cell facing the back wall, and the officers remove the leg irons. The officers leave the cell, the door is closed, and the inmate is asked to stand and back up to the tray slot for the removal of the handcuffs and the attached immobilization strap.

The immobilization strap is a nylon device permanently attached to the handcuff chain by a ring. Its purpose is to assist staff in maintaining control of an inmate should he become disruptive. During escort, the officer holds the strap with sufficient tension to prevent the inmate from pulling forward and away from the escorting officers. The strap also allows the officer to maintain control of the handcuffs once they are removed from the inmate's wrists, without holding onto the loose cuffs themselves.[1] Although the strap was not designed for use by inmates, on numerous occasions, Wilson had asked the defendant, Correctional Officer J. Hall, and other officers to put tension in the immobilization strap so that Wilson could pull against it when getting to his feet after having shackles applied or removed, and the officers had often accommodated him by allowing him to use the strap in this manner without incident.

On August 28, 2009 at 2:20 p.m., Hall and two other officers escorted Wilson from his cell to the recreation cage and placed him inside the cage.[2] While Wilson was held in the

---

[1] The immobilization strap also protects the officers from being injured by the handcuffs. Without the strap, if the inmate lunged forward at the moment an officer was holding one loose cuff while unlocking the other one, the officer could be cut when the cuff was jerked through his hands.

[2] Because of prior behavior issues, an officer videotapes Wilson whenever he is removed from or returned to his cell. Defendants have submitted the video footage taken of the officers removing Wilson from his cell on August 28, 2009, placing him into the recreation cage, removing him from the

recreation cage from 2:20 p.m. until 5:35 p.m., he urinated twice through the cage wire and spit up some blood in the same area.[3] At 5:35 p.m., Sgt. Collins and Correctional Officers J. Baker and J. Hall came to remove Wilson from the recreation cage and take him back to his cell. Baker and Hall observed that the patch of urine and blood which Wilson had deposited on the pavement was located in the area where an officer would normally kneel to place shackles on Wilson's ankles. Rather than kneel in the bodily fluids, the two officers had Wilson kneel inside the recreation cage.[4] Then, they entered the cage and placed the shackles on Wilson's ankles. After also placing handcuffs on his wrists, with the immobilization strap attached to the cuffs, one officer assisted Wilson to his feet by placing a hand under his elbow, and they both escorted him back to his own cell.

Following procedure, Wilson entered the cell and knelt down so that the officers could remove the shackles. Once the shackles were removed, while Wilson remained in a kneeling position, the officers closed the door, passing the immobilization strap through the tray slot in the door. One of them said, "Get up." Procedure called for Wilson to stand up on his own and back

---

cage three hours later, and returning him to his cell. Wilson reviewed the video footage and does not dispute its accuracy, although he asserts that it does not show everything that occurred.

[3] Wilson alleges that he spat up a "huge amount of blood" as a result of inadequately treated dental problems. He received a disciplinary charge for depositing these bodily fluids in the recreation area, but the charge was dismissed. Neither the dental problems nor the disciplinary charge is at issue in this lawsuit.

[4] When the officers told Wilson to kneel, he complained that he had a "bad knee." If an inmate has an orthopedic condition that prevents him from complying with standard shackling procedure, the medical staff will write an order directing that different procedures be used when officers are restraining him. Wilson had no such order in effect. After the August 28, 2009 incident, Wilson requested a "no kneel" order, but his request was denied.

up to place his hands through the tray slot so that the officers could remove the handcuffs. Wilson did not stand up. Instead, he asked the officers to pull on the strap "a little bit." A moment later, Wilson said, "I can't get up like that, Man." Hall then repositioned his hand on the strap and, and as requested, pulled steadily back on it. Two seconds later, Wilson was standing beside the door, and his hands appeared at the tray slot.[5] He placed his hands through the slot, and Baker removed the handcuffs, while Hall stood off to one side. Wilson informed the officers, "I'd like you to notice that my hand is bleeding now. You cut my hand. You can get the nurse over here if you like." Baker told him that they would get the nurse.[6]

Later that day, Wilson filed an emergency grievance (Log #034806), marked received at 7:20 p.m., stating that Hall had purposely pulled too hard on the immobilization strap, causing Wilson to smash his left hand on the tray slot, injuring his index finger and knuckle and leaving a "cut and huge knot" on his hand so that he was unable to make a fist. (Compl. Ex. 5.) The responding officer found that the grievance did not meet the definition for an emergency. Later that day, Wilson also filed an informal complaint, the first step in the prison grievance procedure, stating that Hall had purposely pulled too hard on the immobilization strap, causing Wilson to smash his left hand on the tray slot; Wilson stated that the hand was cut and his knuckle was injured "badly," such that he could not close his hand. (Compl. Ex. 1.)

A nurse examined Wilson's hand at around 9:00 p.m. on August 28, 2009. The nurse noted that there was a superficial skin abrasion and raised area below the fourth finger on

---

[5] On the videotape, at this point, someone said, "There you go." Wilson made other audible comments during this time, but they were only partially understandable on the video recording.

[6] The video footage ended at this point of the incident.

Wilson's left hand; that he reported the injury had occurred when he was taken off the recreation yard that day; that he was added to the list to see the doctor on September 3, 2009; that he was prescribed Motrin for three days according to nursing protocol; and that he was advised to elevate the hand and apply cold compresses. Thereafter, the doctor ordered an X-ray of Wilson's hand. On September 1, 2009, medical was called to Wilson's cell during rounds in the housing unit. He showed the nurse what appeared to be an open blister with a scab over the knuckle, saying, "I think it's infected and broken." The nurse noted very little swelling and no papules of pus, but encouraged Wilson to sign up for sick call.

A doctor evaluated Wilson's hand on September 3, 2009. The record indicates that Wilson complained of tingling in his right and left thumbs and the left side of his wrist and swelling of the left hand.[7] The doctor noted left hand pain and swelling with a possible second metacarpal fracture and indicated that X-rays had been ordered and were forthcoming. Wilson was given Motrin and instructed to keep his hand elevated and to apply warm or cold compresses, whichever felt better. The doctor noted that Wilson was reporting "subjective tingling" in his thumbs and the left side of his wrist, that "neurovascular was intact on exam," and that the tingling should resolve on its own. The doctor also noted that the medical records indicated Wilson had reported similar symptoms at a previous prison facility, which had resolved

---

[7] In a verified statement added to his complaint, Wilson states that his hands remained handcuffed behind him during this examination and that the handcuffs were "covering up actual handcuff 'cuts.'" (Dkt. No. 8.) He claims that after repeated complaints about his hand injuries, a doctor first examined his wrist injuries and evaluated him for complaints of numbness on December 22, 2009.

on their own.[8] On October 9, 2009, three X-ray views were taken of Wilson's left hand. The X-ray report noted no fracture deformity, bony erosion or destructive lesion. The report noted a foreign body near the left index finger, but also indicated that the object had also been present on a prior X-ray done on December 10, 2008.

In the days and weeks following August 28, 2009, Wilson filed additional emergency grievances and informal complaints, alleging that Hall and other officers had threatened him since the incident. Wilson also filed informal complaints, stating that Hall had filed false disciplinary charges against him and that Hall had used profanity and refused to take him to the shower or provide him with clean clothing when scheduled. Two weeks after the incident, Wilson completed a form seeking to add Hall to the list of his enemies. (Compl. Ex. 15.)

In later emergency grievances and informal complaints, in the weeks following the August 28, 2009 incident, Wilson also alleged that he had cuts and severe bruising on his wrists and was experiencing numbness in his arms, fingers and thumbs. Wilson submits a photograph purportedly taken at a local courthouse a month after the August 28, 2009 incident by a "concerned citizen"; the photograph shows a man in an orange jumpsuit, seated and viewed from the elbows to the knees, wearing handcuffs and protective black mitts, with what appears to be a red ligature mark around his right wrist. (Dkt. No. 36.)

On October 21, 2009, a nurse noted that Wilson refused to be seen for sick call, stating that he just wanted to know the results of the hand X-rays. On October 23, 2009, Wilson signed

---

[8] The court also takes judicial notice of the fact that Wilson has complained in prior lawsuits about injuries to his wrists and hands. See, e.g., Wilson v. Collins, No. 7:08CV00638, 2010 WL 785377, *8 n. 17 (W.D. Va. 2010) (noting nurse's observation of red marks on both Wilson's wrists on November 3, 2007 at Wallens Ridge State Prison).

up for nursing sick call, complaining of hand pain, but refused to follow procedures to be escorted from his cell for the visit. On November 2, 2009, security officers called for medical staff to assess Wilson in his cell after he had been placed against a wall. Wilson refused to have his vital signs taken, stating, "I'm alright." He complained of a wound on his wrist. The nurse checked the wrist, noted an abrasion with no active bleeding, and instructed Wilson to keep it clean and dry, and to cover it with a Band-aid.

A doctor examined Wilson's hands again on December 22, 2009. Wilson reported that after "recent security problems," he was experiencing numbness in his wrist and hands, particularly in the right medial thumb and left dorsal thumb. The doctor noted that Wilson felt "touch quality okay" and had linear scabs at the base of the first finger, which were healing with slight redness and no sign of pus. The doctor also noted free range of motion in the fingers, hand and wrist, normal capillary refill, skin intact on hand and fingers with normal color and muscle mass. The doctor noted that Wilson's hands and wrists were functional, that the abrasions were healing, and that he had discussed the X-ray results with the inmate.

**Procedural History**

Wilson filed this § 1983 complaint against Hall in December 2009, raising a claim that Hall used excessive force against him and assaulted him on August 28, 2009 by purposely jerking the immobilization strap with an intent to injure him. The verified complaint states:

> Once I was in my cell C/O J. Hall could not control his anger that C/O J. Baker was smiling at him from getting my blood and urine on him. C/O J. Hall shouts angrily at me to "get up" as it takes me time to get up for I have arthritis in my knee and it has been common practice for C/O's to hold the restraint strap snugly so I can use it for leverage in order to stand as this C/O J. Hall had done countless times before this and earlier this day. Instead of holding the restraint strap snug C/O J. Hall sadistically and maliciously pulls me up backward with hands cuffed

> behind my back pulls my hands up into the trayslot opening. I tell him at this time
> to "stop he is hurting me." Then in anger he executes another sharp hard jerk.

(Compl. 3.) Wilson claims that Hall's actions caused a cut to his left hand, "pain, bruising, [and] nerve pain in both wrists and thumbs (numbness)," and "deep cuts from the handcuffs which . . . left very nasty cosmetic scarring to the top of both wrists." (Id.) He also alleges that the officers did not send a nurse to examine his injuries as promised and he had difficulty obtaining medical treatment. Finally, Wilson alleges that he suffered mental distress as a result of the incident and alleges that he has suffered "reprisals" in the form of "threats of non-return death, frivolous charges, [and] psychological prattle."[9] (Id.) Wilson seeks compensatory and punitive damages.

Before the defendant had answered the complaint, Wilson filed a motion for summary judgment. Hall answered and then filed a motion for summary judgment, supported by affidavits, medical records, and the unchallenged videotape of the August 28, 2009 incident. The court notified plaintiff of Hall's motion as required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and warned plaintiff that judgment might be granted for the defendant if he did not respond to the motion by filing affidavits or other documents contradicting the defendant's evidence or otherwise explaining his claims. Wilson responded, making the matter ripe for the court's consideration.

In his affidavit, Hall states that it is common for inmates to urinate on the recreation yard and that Wilson's doing so on August 28, 2009, did not make Hall angry. Once Wilson was back in his cell, the leg irons were removed, and the door was closed, Wilson remained in a kneeling position. Hall states:

---

[9] In support of the complaint, Wilson submitted more than 90 pages of exhibits.

- 8 -

> I then instructed Wilson to stand and back up to the tray slot to allow staff to remove the handcuffs. Wilson stated that he required assistance getting to a standing position. I instructed him to stand on his own. Wilson asked me to hold the immobilization strap tight so he could use it as leverage to stand up. I tightened the strap by bringing it towards me to remove the slack. Wilson got to his feet without a problem and backed up to the tray slot where I removed the immobilization strap and the handcuffs. I do not recall him complaining to me. I am aware that Wilson later talked to the Sergeant and was checked by the Nurse.

(Deft's MSJ, Ex. IV, ¶ 6.) Hall states that he "did not intentionally jerk on the strap or pull Wilson's hands into the tray slot" or otherwise "attempt to harm" Wilson. (Id. ¶ 7.)

## Standard of Review

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

A verified complaint filed by a pro se prisoner, stating factual allegations based on personal knowledge, is to be considered as the equivalent of an affidavit and may defeat a motion for summary judgment. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979). Although the court must view genuinely disputed facts in the light most favorable to the nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences,

unreasonable conclusions, or arguments." Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (omitting quotation). To defeat a supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (omitting quotation).

## Discussion

Defendant Hall argues that he is entitled to qualified immunity. In qualified immunity cases, the requirement that courts must view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion ordinarily requires adopting the plaintiff's version of the facts. On the other hand, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380 (omitting internal quotations, alterations, and citations) (rejecting plaintiff's version of facts as inconsistent with unchallenged video recording). In particular, where the record contains an unchallenged videotape capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008).

The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800. 818 (1982). When a government official properly

asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 205 (2001)). As it is within the court's discretion to decide which of these questions to consider first, Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 816 (2009), the court begins by considering whether Wilson's allegations state a claim under the Eighth Amendment.

It is well established that "[a]fter incarceration, only the unnecessary and wanton infliction of pain on prisoners constitutes cruel and unusual punishment" in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986) (internal quotations omitted). On the other hand, not every malevolent touch by a prison guard amounts to deprivation of constitutional rights. Hudson v. McMillian, 503 U.S. 1, 9 (1993).

> For an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force.

Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). Plaintiff must prove that, subjectively, the force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Id. (quoting Whitley, 475 U.S. at 320-21). This determination considers these factors: the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made

to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To prove the second component of his excessive force claim, the inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley, 134 F.3d at 634 (quoting Hudson, 503 U.S. at 8). This part of the analysis "evaluates the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Id. Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Id.

> Thus, when prison security measures are taken in response to an uprising or prison disturbance, the courts cannot always expect a perfectly measured response. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

Id. (quoting Whitley, 475 U.S. at 326).

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins v. Gaddy, ___ U.S.___, 130 S. Ct. 1175, 1179 (2010). The extent of the injury the inmate suffered is relevant to both of these determinations: as a factor in determining "whether use of force could plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178.

The record as a whole could not lead a rational fact finder to conclude that Hall used excessive force against Wilson on August 28, 2009 as alleged. Specifically, Wilson fails to

present evidence on which he could persuade the fact finder that Hall acted maliciously or that his actions were "objectively harmful enough to offend contemporary standards of decency." Stanley, 134 F.3d at 634 (internal quotations omitted).

As proof of the subjective element of his excessive force claim, Wilson offers: (a) his conclusory allegation that Hall was angry about stepping in Wilson's bodily fluids, (b) his characterization of Hall's actions as "shouting angrily," "sadistically and maliciously pull[ing Wilson] up backward . . . into the trayslot," and giving another "sharp jerk" of the strap after Wilson told him to stop, and (c) Wilson's allegations that the injuries received on August 28, 2009 have caused long-term pain, disability, and scarring. The record contradicts all of these allegations.

In direct contradiction of Wilson's motive argument in (a), Hall's undisputed evidence indicates that urination on the recreation yard was a frequent occurrence and not something that offended or angered him. Moreover, Wilson's allegations in (a) and (b) are "blatantly contradicted" by the unchallenged video recording of the events. The officers' brief comments about the bodily fluids beside the recreation cage are calm and focused on the facts and the need to make a log entry about what they saw and when. The request for Wilson to "get up" is not shouted with any impatience; it is simply stated as a signal to him that he is now allowed to get up, and the officers stand by the door, waiting for him to do so. When Wilson asks Hall to "pull on" the strap a little bit, Hall wraps the strap around his wrist and keeps his arm still as though to pull against the strap when Wilson pulls against it on the other end to help himself up. When Wilson says, "I can't get up like that, Man," Hall repositions his hand to hold the strap more directly and pulls his arm back slowly and steadily away from the tray slot until he sees Wilson's

hands outside the slot two seconds later. The motions are not jerky or violent in any way and do not pull Wilson's hands inside the tray slot. Wilson makes no shout for Hall to "stop," and indeed, has no time to do so, because the process is over so quickly. Hall makes no jerking motions with the strap after Wilson is standing vertically in front of the tray slot, and immediately, Baker moves in front of the slot to remove the handcuffs. Wilson makes calm, unintelligible comments, and Hall stands calmly to one side. Particularly in light of the video evidence, Wilson's self-serving use of the terms "angry" and "sadistically and maliciously" are precisely the type of "unwarranted inferences" that the court need not accept as fact. Kloth, 444 F.3d at 319.

The video does not prove that Hall's action did not cause Wilson some injury. Hall's pull on the immobilization strap may have been stronger than Wilson expected and may have pulled Wilson off balance so that he struck his hand. The mere fact that Hall's rate of pull on the strap may not have been a "perfectly measured response" to the situation, however, does not prove that he initiated a pull of that strength with malicious intent to inflict harm on Wilson. Stanley, 134 F.3d at 634. Moreover, the video supports Hall's version of his actions as a good faith effort to help Wilson stand up as the inmate had requested.[10]

---

[10] Hall's own version of events on August 28, 2009 is not entirely consistent with the video. For example, Hall states that he removed Wilson's handcuffs, when Baker, in fact, removed them. He also does not remember that Wilson complained immediately about being injured, while the video shows otherwise. These discrepancies, however, are not facts material to determination of the elements of Wilson's excessive force claim, and so do not present any genuine issue of material fact.

Moreover, Wilson's verified submissions do not state a separate claim that Hall deprived him of medical treatment. Even if the court were to construe his submissions as raising a such a claim, the claim is without merit. A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 102 (1976). The record does not support a finding that Hall knew from viewing Wilson's injuries and hearing his comments on August 28, 2009

Wilson argues that the "deep cuts" and nerve damage to his wrists allegedly caused by Hall's pull of the strap on August 28, 2009 are also proof that Hall's action was violent and intentionally harmful. On the video, however, Wilson's only understandable comment about being injured is his complaint that his hand is cut and bleeding. He makes no intelligible mention of his wrists bleeding or hurting and does not even state that he needs medical attention for the cut on his hand. He simply says, "You can get the nurse over here if you like." As the video evidence is thus inconsistent with Wilson's alleged version of his wrist injuries, the court need not consider those allegations as true. Iko, 535 F.3d at 230.

Moreover, Wilson's own exhibits corroborate the video evidence that the only injuries he received on August 28, 2009 were a bump and a cut to his hand. Both the emergency grievance and the informal complaint filed that night, within hours of the incident, reported only that he smashed his knuckle and cut his hand on the tray slot. (Compl. Ex. 1 & 5.) Although these documents reported that these injuries were causing him pain and an inability to make a fist, neither of them mentioned any wrist injuries or pain whatsoever. The nurse who examined Wilson's hand on August 28, 2009 noted only a superficial skin abrasion and raised area below the fourth finger on the left hand. She did not note any wrist injuries or any complaint from Wilson about wrist pain. Although the nurse put Wilson on the list to see the doctor within a few days, the only treatment the nurse deemed necessary that night was pain medication, elevating the hand, and applying cold compresses. Four days later, on September 1, 2009, Wilson reported that he thought the cut on his knuckle was infected and the finger was broken. Again, he made

---

that the inmate had any serious need for more immediate medical attention than he received that night. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

no complaint of wrist pain. The X-ray views taken of Wilson's hand on October 9, 2009 indicated no fracture of his hand.

A smashed and cut knuckle and even a broken finger, while no doubt painful, are not inconsistent with Hall's version of events from August 28, 2009–that he pulled the strap in a good faith effort to help Wilson stand up. These injuries are the sort that can easily occur when one slips on a slick floor and falls into a piece of furniture, for example. Such commonplace injuries do not prove that Hall's pull on the strap was violent or malevolently meant to hurt Wilson in any way.

Wilson claims that the extensive evidence of hand problems he has had in the months since August 2009–pain and numbness in his hands, red marks around his wrists, and tingling–are proof that Hall intended harm. The record as a whole, however, does not support his conclusory allegations that all of these hand problems stemmed from the August 28, 2009 incident. Indeed, the record indicates that Wilson had earlier complained of similar tingling symptoms after incidents with security officers at another prison in 2007-2008 and that he has worn handcuffs on numerous other occasions at Red Onion since August 2009. He offers no evidence on which a reasonable fact finder could determine that his medical conditions involving his wrists were caused by Hall's actions on August 28, 2009. Thus, the record does not support his argument that his wrist problems prove Hall must have jerked the strap with intent to harm.

Finally, the many grievances and complaint forms that Wilson filed about Hall after the August 28, 2009 incident do not add any evidentiary backing for Wilson's claim that Hall pulled

the strap out of anger or malice.[11] None of Wilson's complaints or grievances about Hall's purported threats and other actions has been substantiated. Even if proven, however, these subsequent events could not establish that Hall's use of force on August 28, 2009 was malicious or calculated to cause harm.

In light of the video evidence and other documentation cited, Wilson fails to present any genuinely disputed fact on which the evidence could persuade a reasonable fact finder that, subjectively, Hall had the culpable state of mind as necessary for a successful claim of excessive force. Stanley, 134 F.3d at 634. Similarly, the video evidence is entirely inconsistent with a finding that Hall's action on August 28, 2009–pulling on the immobilization strap in response to Wilson's request for assistance–was objectively harmful enough under the circumstances to offend "contemporary standards of decency" as required under the second part of the excessive force analysis. Id.

## Conclusion

For the stated reasons, the court finds and concludes that Wilson has failed to forecast evidence such as to create a genuine issue of material fact as to the elements of his excessive force claim against Hall. Accordingly, the court concludes that Defendant Hall is entitled to

---

[11] Although Wilson states in his complaint that he has suffered "reprisals" since the August 28, 2009 incident, he does not state any separate § 1983 claim in his verified pleadings that Hall personally retaliated against him, and the court will not use his allegations in his unsworn grievances attached to the complaint to construct a claim on his behalf. In any event, conclusory allegations of reprisals in the exhibits are insufficient to state any actionable claim under § 1983. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). Wilson fails to allege any facts on which he could prove that the adverse actions allegedly taken against him were motivated by his exercise of any constitutionally protected right. Id. at 75. Similarly, Wilson's allegations that Hall has "threatened" him are insufficient to state any actionable claim under § 1983. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) (finding that verbal abuse and harassment by guards, without more, does not state any constitutional claim).

summary judgment as a matter of law.[12] Wilkins, 130 S. Ct. at 1179. For the same reasons, plaintiff's motion for summary judgment must be denied. An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and counsel of record for the defendant.

ENTER: This 20th day of May, 2010.

/s/ Glen E. Conrad
United States District Judge

---

[12] Although this conclusion rests on a finding of no genuine issue of material fact in dispute as to the Eighth Amendment excessive force claim itself, the same conclusion also entitles Hall to summary judgment on the ground of qualified immunity, as he has thus met the threshold requirement under that analysis. See Henry, 501 F.3d at 377.